for the City of Houston. The primary issue that brings us here today is the jury's answer to question number two. The jury found that Chris Zamora's citation for untruthfulness and the accompanying 10-day suspension would not have happened but for his father Manuel Zamora and or Chris himself engaging in protected activity and to to affirm that finding the judgment based on that the court has to hold that the cat's-paw theory of liability is viable in a but for Title VII retaliation case after Nassar and perhaps it is. Our position is that it is not but it needs to be clarified and even if cat's-paw is still viable after Nassar, it shouldn't apply here because the evidence doesn't support the but for finding. There was a break in the chain of causation by independent investigations and there was no evidence that the people who were the rubber stamping any recommendations for below. But it was based on those recommendations that the suspension occurred. It was. It was. And so I apologize. I didn't mean to start talking while you were still. All right. Yes, yes indeed it was but it wasn't a rubber stamp because they did an extensive investigation on their own and so it might be that Mr. Zamora presented evidence that the retaliatory animus of his supervisors in the crime reduction unit could have been a motivating factor but that's not the standard for Title VII retaliation claims after Nassar and so a motivating factor would not be but for causation. So even if the cat's-paw theory is still viable, it doesn't apply here because there's no evidence to show that the retaliatory animus, if there was some, on the parts of his CRU supervisors, Sergeant Muskowski, Lieutenant Casco, and possibly Captain Graham, although Mr. Zamora's testimony about Captain Graham having a retaliatory animus is kind of ambiguous, but say that those three people may have harbored some retaliatory animus and they were his supervisors in the crime reduction unit, the CRU. There is no evidence to show that that was the reason that the people much higher found that he was untruthful and should be suspended for untruthfulness. Counsel, let me make sure I understand the context of this argument. You're not challenging the jury instructions in any way on this issue, correct? That's correct. So they were told how to analyze the evidence on this point in a way maybe right, maybe wrong, but it's not challenged here. So it's strictly a sufficiency that the jury could not have looked at the evidence regarding what these three supervisors or however many there were, what their role had been, and whether it was the not just motivating but was in fact the cause, by far, cause of the termination. That's a pretty high hill you're trying to climb. What is missing that the jury could not fill in by reasonable inference? Right. Okay, this takes too many inferences. There's speculation and inference, but not just one level of inference which is permissible. There's inference stacked upon inference. It's because of the distance between the people with the alleged retaliatory animus and the people who were the decision-makers and the process that went on in between. Here are the relevant facts. All right, Chris Zamora was in this crime reduction unit. He was there about seven months and then he was transferred out of it in May of 2008. Prior to that, his father, who was also an HB officer, Manuel Zamora, had a lawsuit about six months before that against the city of Houston. And around the same time that Chris was transferred out of the CRU, Manuel, his father, also filed an EEOC complaint. He was alleging discrimination by the city against Hispanics and against himself personally. Chris got transferred out of the CRU. He said that was in retaliation for his father's protected activity. Chris then later joined his father's lawsuit. The jury found that that was not retaliatory so that these people who were his supervisors in CRU had no retaliatory animus pertaining to transferring him out of the CRU. So that's not even before the court. And that's the thing that is really the tightest, factually, that could conceivably have been a retaliatory act. But the jury found it wasn't and that's not here. Now, then we get to the next step. And that was after Chris was transferred out of the CRU, his father filed a complaint with the Internal Affairs Division, complaining that about the transfer out. So the Internal Affairs Division then took over and started an investigation to see if there was some evidence. And that was a very extensive investigation. They talked with 22 witnesses, including Manuel Zamora, the one who filed the complaint. They talked with Chris Zamora himself. They talked with 20 other people, at least, and I've named all of them on page 5 of my opening brief and given the record site for this. So they talked with all these people. They reviewed hundreds of pages of documents. And in the course of this, they concluded that Christopher Zamora had been untruthful in three areas. So it's like that isn't what they were going to look for, but this was a situation in which the investigation just turned this up. They said Christopher Zamora has said that he was untruthful in three areas. He secretly tape recorded a conversation and they asked him where he got the tape recorder and he said he got it from this one officer who said, no, I didn't give him that. They decided that the other officer was credible. Chris Zamora was not. They recommended that he be cited for untruthfulness for that occurrence. There was another instance in which he said that he signed something under duress and the duress example he gave was that his sergeant didn't announce that he, Chris, had received an award for being patrol officer of the year. And he had said something good about someone else, but didn't say something good about Chris. And so he felt like he was being slighted and he considered that to be duress. Well, during the investigation, they learned that that award wasn't until two months after he was transferred out of that unit and so not mentioning that award couldn't even have happened in that time frame. It was the wrong time frame and so they said Chris was untruthful about this. And thirdly, they said that Chris complained that he had been transferred and other officers had not been disciplined for worse things that they had done. And he didn't even know about the discipline that those other officers had and they found him to be untruthful in saying this. Now, I'm sorry, the investigation in the internal affairs and we're not even yet up to the administrative disciplinary committee, which is still a level above that. And then the chief above that is the one who ultimately imposed the 10-day suspension. And so the administrative disciplinary committee consists of a combination of police officers and supervisors and four independent citizens. And so that would be closest to what you're referring to as an independent review committee. And that's the one that reversed the finding of that he was untruthful? No, Judge Wiener, let me, I see what you're talking about now. No, he appealed to an arbitrator. He appealed a finding to an arbitrator. And the arbitrator then said this isn't a proper finding of untruthfulness. And so that's who it was. That's what I was getting at. I apologize for not understanding what you were asking, but that's exactly right. Now, so this internal affairs division in this investigation that was headed up by Sergeant Dirk Bogard in internal affairs, interviewed 22 witnesses. They reviewed hundreds of documents to see if there was some discrimination or retaliation against Chris. And in interviewing Chris himself, they found these three instances that they believed he was being untruthful. Now, to understand how they get to this determination that he's untruthful, we need to see it in the context of general order, the HPD general order 200-08 on truthfulness. And it says an officer shall not be untruthful either knowingly or recklessly. And when the arbitrator later reversed the 10-day suspension for untruthfulness and said that they shouldn't have found him to be untruthful, the arbitrator said that these aren't really clear indications of intentionally misrepresenting. But the general order also includes recklessness. And so each one of those instances could have been understood by the internal affairs as reckless. Really, I think it's a matter of law. This isn't even up to a jury to decide that. This is within their domain as making a managerial, what would be considered out in the private sector. And so the internal affairs division conducted this investigation into Chris's father's complaint. And in the course of that, they uncovered these three, or they are faced with these three instances that they believe that Chris is being untruthful. Lieutenant Spute of internal affairs then recommended that Chris be cited for untruthfulness. Now, Christopher Zamora admitted in his testimony that Lieutenant Spute has no retaliatory animus. The highest up that the retaliatory animus goes, as far as Chris Zamora's testimony, is those supervisors in the CRU. And that's prior to all this investigation. So all this investigation then leads to findings, they believe, of him being untruthful, remembering that that can be reckless, not just intentional, but reckless. And so Lieutenant Spute recommends a citation for untruthfulness. And then it goes up another level to the administrative disciplinary committee, which consists of five, as I was mentioning, five police officers and supervisors plus four independent citizens. They review all these documents, hundreds of documents, all these witness statements. They review the law, the policies, and they say, well, it looks here like we've got a case where Christopher Zamora was untruthful on multiple occasions. And the head of that committee, which was Captain Zera, recommended the ten-day suspension, well, excuse me, no, he did not. He recommended that Christopher Zamora be terminated for being untruthful. But the committee overruled that recommendation, and they recommended a ten-day suspension. Let me back up just one step. Lieutenant Spute of the IAD also recommended that Chris be cited for bad judgment for being overly influenced and manipulated by his father, Manuel Zamora. But that didn't go anywhere else. And, again, Chris testified that there was no retaliatory animus by Lieutenant Spute. Chris also said there was no retaliatory animus by anyone in the Administrative Disciplinary Committee, the ADC, which is higher up. And they're the ones who then, upon this review of all these documents, many witness statements, including Chris and his father, then made this recommendation of a ten-day suspension, citation for untruthfulness and a ten-day suspension, made it to the chief of police, Charles McClellan, Chief McClellan. And so then Chief McClellan reviewed all that, used his own knowledge and understanding about the way all this works, and imposed a ten-day suspension. Christopher Zamora appealed that to the arbitrator, who said, no, this wasn't right. And so it was, the suspension was reversed. And during the course of this trial, Chris was promoted to sergeant. All these steps between the people who Chris alleged had this retaliatory animus and the various people who found that he was untruthful and the ultimate decision-maker who imposed it show that there was a break in the chain of causation. Under this Court's opinions in Motto and Long, which I've cited in my brief, that break in the causation is enough to eliminate the but-for causation from this low-level animus down here. With respect to this suspension, did the chief of police rely on any other evidence or statements other than those initially given by his supervisors? Yes. The entirety of the file from the IAD, which included hundreds of pages, and the entirety of the file from the ADC, the Administrative Disciplinary Committee, because that consisted of way more than the three supervisors. Did he reference that? I'll have to look and see. I believe that I've cited the place in the record in my brief where it says what he referred to. You can look it up. Certainly. And if the Court would like, I can supply a letter brief and I understand where a letter brief is. Okay, good. All right, thank you. You have time for rebuttal. Mr. McKnight. May it please the Court, Robert McKnight, for the Plaintiff Christopher Zamora, who's the appellee and cross-appellant in this matter. I agree that the issue of cat's paw causation, which I would describe as a process of causation, needs to be clarified when it occurs in the context of but-for causation, which I describe as a degree of causation. We've briefed that issue. Judge Atlas addressed it very well, I believe in her memorandum and order of last year. What I want to call now to the Court's attention are some new cases since our briefing addressing the issue of but-for causation in a cat's paw scenario. These cases have no problem with the issue of cat's paw causation in a but-for scenario. The first one is EEOC v. New Breed Logistics, 783 F. 3rd, 1057. The Penn site would begin at 1070, 6th Circuit, 2015. The Court there affirmed a verdict of liability where the retaliation, and it was retaliation, it was clearly a but-for degree of causation that was required, where the retaliation occurred through a cat's paw process. The Court was satisfied that that was perfectly fine. Crabtree v. Secretary, U.S. Department of Homeland Security, that's an unpublished decision from the 6th Circuit, 2015, Westlaw, 1948267, 6th Circuit, 5115. A little quote from it, the employer can be a cat's paw theory if the plaintiff shows two elements. First, a supervisor was motivated by retaliatory animus and took an action intended to result in the plaintiff's termination in that instance, but fill in adverse action. These cases that aren't in your brief? I'm sorry? These cases that you did not include in your brief? Yes, Your Honor, because they were issued after our brief was filed. Oh, okay. These are 2015 cases. I missed that part. And then the third one is Godwin v. Wellstar Health Systems, 2015, Westlaw, 3757354, 11th Circuit, 2015, also unpublished. But, again, not having any problem with the idea of but-for causation in a cat's-paw scenario. Also, McKenna v. Philadelphia, or City of Philadelphia, from the 3rd Circuit, is cited in our brief, and it is also, I just want to emphasize also, a but-for degree of causation in a cat's-paw scenario. So there is a growing post-ob agreement or consensus, or at least no opposition to the idea that but-for causation can be satisfied in a cat's-paw scenario, and I don't think that there has been any decision that has actually held that it's not. The 5th Circuit did in that one case cite or say in dicta that we have a question now since Staub whether but-for can survive in a cat's-paw, whether but-for can work in a cat's-paw scenario. But that's the only thing that I know of and that's been cited, I believe, that would even remotely support their position on cat's-paw not being available where but-for is the standard of causation. Would you address the future reputational harm damage argument that you're making? Yes, Your Honor. And just to put that into context, they filed their brief as the appellant and addressed sort of in globo all of the damages, the past damages that the Court affirmed and the future compensatory damages that the Court ruled in their favor on. So they just said, you know, 150, there's no legally sufficient evidence for any of this, even though they'd already knocked out 127,000 in the JMOL. So in our cross-appeal brief, we addressed why the future damages should be put back in. And then in their reply brief, their third brief, they just addressed liability. They did not address our cross-appeal on the damages issue, on the future damages issue. And so we did not file a reply brief on the future damages issue. So that's why you don't see a reply brief from us as the cross-appellant. It's because their second brief did not respond to our argument. We hear from the jury's award that the JMOL reversed that, what, I think it was 127,000? It was 127,000. Was it clear from the jury verdict that that was only for reputational? Or could it have been mixed reputational and emotional? I'd like to take a moment to look at the jury interrogatory on that. Yes, there is a... Because it's my understanding the emotional has been dropped. Or future, that is correct. And that is correct. I'm sorry, I don't have the jury verdict form tabbed for immediate reference here. I think counsel opposite has it for you. Oh, thank you so much. The question for future damages was, well, what sum of money, if any, paid now in cash do you find would fairly and reasonably compensate Plaintiff Christomore for his actual damages, if any, suffered as a result of the defendant, City of Houston's actions, that you have found would not have occurred but for the retaliation? And then the items are emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-monetary losses. So reputation was not specifically enumerated as one of the items, but it was certainly argued. Did the jury award just a lump sum in response to that? Yes, it did. In the future, answer in dollars and cents, 127. And reputation was certainly argued extensively. So it falls under the general category, I believe, of non-monetary losses. He had no claim for monetary losses. So the district court held, as a matter of law, on the Rule 50 motion, that there wasn't legally sufficient evidence for the future compensatory damages. And again, there's only our briefing, essentially, on that subject, because they didn't respond to it, and so we didn't reply to it. But it's our position, regardless of what the actual number should be, because the judge didn't do a remediator, she didn't just reduce it. And so we're not here to talk about what is the appropriate number for compensatory damages. It's just, was there legally sufficient? If we were to reverse Judge Atlas on her JNOV, would we have to then remand for a determination of quantum on a remediator? I believe that would be correct. I don't think the court could, as a matter of law, here say . . . Not from the record. Right. It should be this. I think that would have to be remitted to the district court. This case has certainly been on the district court's plate for a long time. And I understand reluctance to send it back for further proceedings for something like that. You could always agree. We could. Unless there is something in the record that would quantify the various elements. I gather there are not. Well, it is that sort of compensatory damages question that generally would be up for the jury. And then I think a remediator motion would be an abuse of discretion standard as opposed to the JNOV overview that you have to give to the question of whether there's legally sufficient evidence. So it would be a challenge, I think, for the court of appeals to come up with an appropriate number for the future compensatory damages. But on the issue that really is before the court, that is whether there was legally sufficient evidence to support future compensatory damages, again, there was plenty of evidence about the damage to reputation that the plaintiff continues to suffer as the defendant's representatives and witnesses in the trial testified right there for the jury. They still think that he's a liar. They said he's a liar. We think the arbitrator who reversed the findings was wrong. We think he's a liar. And in that situation, I think it was extraordinarily reasonable for the jury to say he's continuing to suffer some degree of future reputational harm. The difficult question is quantum. The difficult question is the quantum, exactly. There are a few things if we've exhausted the topic of future damages. I just would like to address concerning the argument that we heard a few moments ago. First of all, the contention is made that Katz-Postenario requires rubber stamping. Essentially, the higher level non-animated, I'll say non-animated because in the sense of not having retaliatory animus, that that person just rubber stamps the decision that's made by the lower level individuals that we're concerned with. In this case, Lieutenant Casco, Sergeant Muskowski, Captain Graham. There is no such term in Staub v. Proctor Hospital. The Supreme Court just talked about the person with animus taking an action intended to cause an adverse action and that ends up being the proximate result, the proximate cause of whatever the adverse action ultimately taken might be. There's no requirement there be some rubber stamping. It's just proximate cause. The court spoke of proximate cause in Staub as something that just has some sort of direct connection with whatever the action was taken by the person with animus. Black's Law Dictionary defines proximate cause a cause that is legally sufficient to result in liability. An act or omission that is considered to result in a consequence so that liability can be imposed on the actor. There's no notion that the ultimate decision maker just has to have rubber stamped the lower level decision. There was also the contention that there are just too many inferential steps you have to get through to find that the ultimate decision makers, Chief McClellan who imposed the discipline, was the cat's paw of any of these lower level guys. Their point is that there was an independent investigation done by, I don't know who exactly they're claiming did the independent investigation, because the record is clear. Captain Zera, Z-E-R-A, who chaired the Administrative Discipline Committee, testified that the committee met, did all of its work in about an hour. This wasn't the only case on their docket. They had gotten the file a week before, so they'd had a chance to read the file. They met and discussed this case along with several others in about an hour. That's in the record, document 402, page 187 of Captain Zera's testimony, approximately lines 9 to 19. It took about a day. Well, I'm sorry. I would guesstimate that it was approximately, probably about an hour to do all of these cases. There was no independent investigation that was conducted by the administrative discipline. What about all those other witnesses? All of the other witnesses, what's important to keep in mind is that when Manuel Zamora filed his IAD complaint, he filed a very extensive IAD complaint. It went on for about, I don't know, 50 pages at least, probably. He accused Executive Assistant Chief Munden in the Houston Police Department of perjury. He accused Captain Graham in the Crime Reduction Unit. He accused Lieutenant Casco. He accused Sergeant Muskowski. There was a lot to investigate. A lot of statements were collected from a lot of people, but when you look at the untruthfulness findings, the three very discreet untruthfulness findings that emerged from the IAD process, and that's before the fourth one got added. I'll mention that in a moment. But there were three very narrow untruthfulness findings. It was, okay, you say that you've been punished, but you're saying that nobody else got punished? And he said, well, no, Officers Morelli and Tegel, they brought a prisoner into lockup, and he had a weapon on him. They hadn't searched him properly, and they didn't get in trouble the way I did. They were not chastised, I think was his phrase. And so that didn't require 22 witnesses to resolve what that dispute was about. It depended on what Sergeant Muskowski and Lieutenant Casco said about how they had responded to that situation. And I believe that Sergeant Muskowski said he dealt with it immediately. He said, I dealt with that immediately. Well, no, he didn't deal with that immediately. It actually took a few months before those guys were suspended for a day. And that's what happened. They were suspended for a day. There was also testimony that they went to the jail for a week to get remedial work on how to search people. However, Sergeant Morelli testified at trial that he agreed to do that. He almost sounded like he was volunteering to do that, whereas Sergeant Muskowski said, oh, I required him to do that. So what our contention is, and what we believe the jury reasonably inferred from the evidence, is that Sergeant Muskowski was making this Morelli-Tagel thing, making it look more like Officer Zamora was being untruthful with respect to saying, no, they weren't chastised. He was trying to say, oh, no, I dealt with that immediately, when that wasn't really the case, trying to create a conflict between his statement and the Zamora statement that he'd been given the opportunity to review. That's one example. The other untruthfulness issue, one of the other untruthfulness issues, was whether Officer Horne gave him a tape recorder or whether he had gotten it himself. Well, that didn't take 22 witnesses to resolve. It was just Lieutenant Spute saying, okay, Officer Horne said this, Officer Zamora said that, I'm going to believe Officer Horne. So the fact that there was this gargantuan IAD investigation, well, most of it had to do with all of those issues involving Manuel Zamora's complaints, but very few of them actually had anything to do with the narrow untruthfulness findings for which Officer Zamora was cited. There was the fourth issue that was added on. It had to do with whether he had sufficient notice of the meeting on March 7, 2008 that Officer Zamora had recorded. The question, the view of Chief McClellan was, I believe, that since he came to the meeting with various binders,  and so when Chris Zamora said, I didn't have notice of the meeting, he must not have been telling the truth because he came with some binders. Well, it was undisputed that he had some notice, but their view was, well, he didn't have enough notice to create binders full of material. As a matter of fact, though, at the meeting, or later in his deposition, Captain Graham said, well, the binders, they were all beside the point anyway. So clearly, I mean, if he had noticed, he spent a lot of time putting together something he didn't need to. The idea here is that the IAD process took minor disputes about factual issues, and even if the city was right in resolving them against Officer Zamora, even if the arbitrator was wrong, there were still such minor issues in comparison with the gravity of being found untruthful. Under HPD's system, to be untruthful is a seriously bad offense. And so they're taking these minor little issues and using them against Officer Zamora, even while, and the jury saw this, IAD was perfectly content to indulge rather significant inconsistencies. When officers, when Sergeant Miskowski and Lieutenant Casco described the meeting on March 7, 2008, they said Officer Zamora took no responsibility for anything. Well, that proved to be false. But in IAD's view, that was just a minor inconsistency. So there was comparative evidence as well.  Thank you, Your Honor. Responding to the last comment about Officer Zamora taking no responsibility, the indication that Officer Zamora provides for having taken responsibility is where he testified that he's young and makes mistakes. That's not the same thing as saying, I really did something wrong, I had bad judgment, I used bad judgment here, and so forth. It's a very vague kind of superficial skimming along. I'm young and make mistakes is the same sort of thing you can say to just not knowing how some protocol works. That's not what Lieutenant Spute or even his direct CRU supervisor, Lieutenant Casco, would have thought was taking responsibility for his bad choices, his bad decisions. On the matter of inferences and this distance, I just direct you to page 20 of my opening brief, where there's a point from which the jury could infer retaliatory intent on the part of the CRU supervisors, based on the things that Officer Zamora testified to. But nothing above that. And so this finding, question number two, would require that the jury infer that retaliatory intent on the part of the CRU supervisors, Sergeant Muskowski, Lieutenant Casco, and Captain Graham, in the absence of any evidence about that. But then that they infer that those CRU supervisors influenced Lieutenant Spute's investigation to the degree that he ignored all the other witness statements and documentation, and that it resulted in a skewed investigative point. And there's no evidence of that. In fact, Lieutenant Spute, as counsel just said, pointed out that Lieutenant Spute chose to believe Officer Horn. That was Lieutenant Spute's decision. There's no influence from the supervisors about who he believes. If Lieutenant Spute was presented with a statement from Officer Horn, no, I didn't give him that tape recorder, and Officer Zamora says, I got it from Officer Horn, then Lieutenant Spute is in the position of deciding who to believe. And that kind of a credibility determination is similar to what juries do. You take what's presented in front of you. And he may also have taken, here's what I know about Officer Horn, here's what I know about Christopher Zamora. There's no indication that he based it on anything from Muskowski, Casco, or Graham. He chose to believe Officer Horn. What about Durden and Munden? Chief Munden? I'm sorry? And Durden. Oh, and Durden. They were... Sergeant Dirk Bogard... Okay. This would be, again, the second level of inference. That... Or the third level of inference. Infer with no evidence of the effect of influence in supposedly skewing this investigative report in turn influenced Captain Zera regarding whether to recommend a suspension. Sergeant Bogard was in the Internal Affairs Division and heading up this investigation. There is no evidence that he had any retaliatory animus. And in fact, on the contrary... Officers Zamora testified that there was none. Officers Zamora testified that there was no one at the IAD level or above with any retaliatory animus. The only place that anyone allegedly had any retaliatory animus was his immediate supervisors in the CRU. So he didn't... He said that Sergeant Dirk Bogard, Lieutenant Casco... Excuse me. Let me get the names right. Sergeant Dirk Bogard and Lieutenant Spute in the IAD had no retaliatory animus. So they would have to be a cat's paw. But they did this extensive investigation, which counsel is saying isn't really very relevant. But they investigated this, and during the course of the investigation is when they encountered these untruthful statements. Officers Zamora said there was no retaliatory animus there. And then further up the chain, Captain Zara... Again... Officers Zamora testified there was no retaliatory animus there or from Chief McClellan. And in fact, Officers Zamora even stated that Chief McClellan, the decision-maker who imposed the suspension, was not a cat's paw. So I don't know how we even get there. All right. Thank you.